UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| BRENT HARNISH, JULIE HARNISH, ) | |
| STEVEN HECKAMAN, and ) | |
| JANIS KENGIS, ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | 3:10 CV 511  PPS |
| ) | |
| LIBERTY FARM EQUINE ) | |
| REPRODUCTION CENTER, LLC, ) | |
| DEGRAFF STABLES KENTUCKY, LLC, ) | |
| DEGRAFF STABLES, INC., and ) | |
| ROBIN DEGRAFF, ) | |
| ) | |
| Defendants, ) | |
| Third Party ) | |
| Plaintiffs, ) | |
| v. ) | |
| ) | |
| UNITED STATES and ) | |
| TIM and SHANNON GILLESPIE, ) | |
| ) | |
| Third Party ) | |
| Defendants. ) | |

## OPINION AND ORDER

Several valuable stallions contracted an equine disease from a breeding facility in Kentucky. The owners of those stallions sued Defendants Liberty Farm Equine Reproduction Center, LLC, DeGraff Stables Kentucky, LLC, DeGraff Stables Inc., and Robin DeGraff (collectively "the Stables"). The Stables turned around and filed a third party complaint against the United States and Tim and Shannon Gillespie. Before the Court is Tim and Shannon Gillespie's Motion to Dismiss the Third Party Complaint for Lack of Personal Jurisdiction. [DE 109.] I permitted limited discovery on the issue, and then held a rather uneventful hearing on the matter.  For the following reasons, the motion to dismiss is granted.

**Background**

I'll begin with the undisputed facts. The Stables operates an equine reproduction facility in Midway, Kentucky. The various Plaintiffs contracted with the Stables to participate in its boarding and breeding program, and later brought this lawsuit after their horses boarded at the Stables contracted Contagious Equine Metritis ("CEM"), a foreign animal disease that's characterized as a transmissible venereal disease.

The horse that is alleged to have brought the disease to the Stables is named "Zips Heaven Sent," a stallion owned by Tim and Shannon Gillespie. Working with Robin DeGraff, the Gillespies entered into a contract with the Stables to participate in its 2008 "On-Farm Cooled Semen Stallion Program" between December 21, 2007 and January 2, 2008. [DE 105-2.] On December 12, 2007, Zips Heaven Sent moved to the Stables, bringing along CEM and causing the outbreak at the Stables.

While negotiating its contract with the Stables, the Gillespies were living in Wisconsin, and Zips was boarded there. They negotiated with Robin DeGraff over the telephone, and the Gillespies believed DeGraff was either in Kentucky or Ohio during those conversations. [Tim Gillespie Decl., DE 69 ¶ 5.] The Gillespies drove Zips to the Stables in Kentucky for the 2008 season, and afterwards sold Zips to a farm located in Indiana. Now the Gillespies live in Ohio.

In the Amended Third Party Complaint, the Stables seek recovery from the Gillespies for breach of contract and contribution. The Gillespies responded with a Motion to Dismiss for Lack of Personal Jurisdiction. The Gillespies contend that their contacts with Indiana are insufficient for this Court to assert personal jurisdiction over them. For its part the Stables argues that the Gillespies have marketed Zips extensively, attempting to stand him at Indiana farms and

2

ultimately selling him to an Indiana farm, albeit after the fact.  Each party submitted affidavits to support their version of the facts, and I granted the parties' request for a hearing to ferret out the factual issues. I wanted to hear from the witnesses so I could evaluate their testimony in person and weigh their credibility. But alas I was disappointed. At the hearing, both parties argued their points but rested on their papers without testimony from either Robin DeGraff or Tim or Shannon Gillespie.  Now, based on those submissions, I'll resolve the motion.

## Discussion

The Gillespies seek dismissal for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).  A federal court's personal jurisdiction is determined by the laws of its forum state.  *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010).  Indiana's long-arm statute allows jurisdiction so long as it's consistent with the Due Process Clause of the Fourteenth Amendment. In other words, they are co-extensive.  Ind. R. Trial. P. 4.4(a); *Rodriguez v. Cavitec AG*, 2010 WL 2519715, at *4 (N.D. Ind. June 14, 2010).  As a result, the state statutory and federal constitutional inquiries merge, and the determinative issue is whether the exercise of jurisdiction over these Defendants comports with the federal Due Process Clause.  *Tamburo*, 601 F.3d at 700; *Terry McKannan v. National Council of Young Men's Christian Assocs. of the U.S.*, 2010 WL 4668437, at *3 (S.D. Ind. Nov. 9, 2010).

To confer jurisdiction, due process requires a defendant to have purposefully established "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal citations and quotations omitted); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).  Crucial to this analysis is a showing that the defendant "should

reasonably anticipate being haled into court [in the forum State]" because it "purposefully avail[ed] itself of the privilege of conducting activities" there. *Burger King*, 471 U.S. at 474-75. Personal jurisdiction can be general or specific depending on the extent of the defendant's contacts. *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex*, 623 F.3d 440, 444 (7th Cir. 2010). General personal jurisdiction involves an analysis the defendant's contacts with the forum state that are unrelated to the allegations in the lawsuit. Specific personal jurisdiction, by contrast, reviews the defendant's contacts that are related to the subject matter of the lawsuit. *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 & nn. 8-9 (1984). Here, the Stables conceded at the hearing that this Court lacks specific jurisdiction over the Gillespies, but contends that general jurisdiction exists.

A defendant is subject to general jurisdiction when it has "continuous and systematic general business contacts" with the forum state. *uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 425-26 (7th Cir. 2010); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415–16, 104 S.Ct. 1868, 80 L. Ed. 2d 404 (1984). This is a demanding standard that requires the defendant to have such extensive contacts with the state that it can be treated as present in the state for essentially all purposes. *See Tamburo*, 601 F.3d at 701; *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 787 (7th Cir. 2003). The standard for general jurisdiction is demanding because the consequences can be severe: if a defendant is subject to general jurisdiction in a state, then it may be called into court there to answer for *any* alleged wrong, committed in *any* place, no matter how unrelated that conduct is to the defendant's contacts with the forum state. *See id.*

The plaintiff bears the burden of establishing personal jurisdiction over the defendant.

*Tamburo*, 601 F.3d at 700. Where an issue is raised by a motion to dismiss and decided on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing that personal jurisdiction exists. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). And in evaluating whether the prima facie standard is satisfied, any conflicts are resolved in the plaintiff's favor. *Id.* However, where there are disputes as to material facts supporting personal jurisdiction, the court must hold an evidentiary hearing. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). Where the court holds a hearing to resolve those disputes, it is the plaintiff's burden to establish personal jurisdiction to a preponderance of the evidence. *Purdue Research*, 338 F.3d at 782.

Because the parties briefing showed disputed facts related to personal jurisdiction, I permitted discovery and held a hearing on this issue. But as I noted, the parties didn't take advantage of the chance to elicit testimony on the disputed facts. The Stables rely only on DeGraff's affidavit and the documents they produced during discovery. And for reasons that remain unclear to me, the Gillespies didn't testify even though they traveled to Hammond, Indiana from Ohio for the hearing. Instead, they also rely on their papers and Tim Gillespies' two declarations. As no evidence was submitted at the hearing, the preponderance burden doesn't apply and the Stables must only make a prima facie showing that personal jurisdiction exists. *See Purdue Research*, 338 F.3d at 782 (where the court rules on the motion to dismiss based on submission of written materials, the plaintiff need only make a prima facie case of personal jurisdiction). Nonetheless, the Gillespies' choice to not testify is not fatal because it's clear that this Court does not have personal jurisdiction over the Gillespies.

DeGraff's affidavit and supporting documents focus on four facts to show general

jurisdiction:  (1) the Gillespies marketed Zips for breeding in Indiana; (2) the Gillespies negotiated for Zips to be sent to Indiana for the 2008 breeding season; (3) the Gillespies sold Zips to an Indiana farm; and (4) the Gillespies traveled to Indiana with Zips.[1]  Based on the Gillespies' evidence, not all of these facts are true, but even if they were, they'd be insufficient to establish that the Gillespies have continuous and systematic business contacts with Indiana.

DeGraff states in her affidavit that the Gillespies marketed Zips to Indiana residents and businesses in 2008 through equine trade magazines, website advertisements, and communication to buyers. [DE 83-1 ¶¶ 25-26.] She attaches several pages printed from a website listing three horses bred from Zips' semen. [DE 110-1, at 15-16] DeGraff also states that the Gillespies have sold and shipped semen from Zips to Indiana residents, and attach several pages of marketing documents.  [DE 83-1 ¶¶ 30-33, at 15-16, 19-27.] The Gillespies acknowledge that there were a few horses bred from Zips that ended up in Indiana, but Tim Gillespie states that they never affirmatively or actively solicited customers in Indiana, and the publications that advertised Zips were distributed nationally – they weren't focused on Indiana. [DE 87-1 ¶ 4.]

The Gillespies marketing efforts are far from continuous and systematic contacts.  For one, DeGraff admits that the Stables had a hand in many of those advertisements.  Also, Tim Gillespie states that they've marketed Zips on a national level, and the Stables hasn't produced evidence showing that the Gillespies focused its marketing strategies on Indiana.  The result wouldn't change even if the Gillespies did market to Indiana specifically because the act of

---

[1] During the hearing the Gillespies objected to DeGraff's submissions.  They argue that the Stables's exhibits, including emails, web sites, and scanned fliers advertising Zips, are inadmissible hearsay. [*See* DE 110-1, at 14-17; DE 110-2, at 11-28.] Most of the exhibits aren't properly authenticated and constitute hearsay.  I won't strike them, however, because it's apparent that personal jurisdiction doesn't exist even when taking them into account.

6

marketing in a state doesn't constitute "continuous and systematic" business contact with that state. In fact, the Seventh Circuit has held that even billboards located in the state – a more deliberate marketing tactic – aren't sufficient contacts for general jurisdiction. *uBid*, 623, F.3d at 426. Here, the most the Gillespies did was send mailings into Indiana and make information available over the internet. Such efforts are neither systematic or continuous contact with Indiana.

DeGraff also states that the Gillespies negotiated to send Zips to Gumz Farms in North Judson, Indiana, for the 2008 breeding season, but they fell through. [DE 83-1 ¶ 21.] In support, the Stables submit an email exchange between one of the plaintiffs and Robin DeGraff, where the plaintiff (a woman named Julie Harnish) states that she heard that the Gillespies were sending Zips to Gumz Farm for the 2008 season. [DE 110-2, at 13-14.] Let's set aside for the moment that this statement appears to be made by someone without personal knowledge of the matter and that it appears to be hearsay. Tim Gillespie rebuts the evidence with a statement in his affidavit that he and Shannon never spoke with Gumz Farms about sending Zips there for breeding. [DE 87-1 ¶ 1.]

Neither parties' evidence is particularly persuasive, and it would have been helpful to have testimony from the parties on this issue to enable me to evaluate their credibility. However, because neither party testified, I must resolve conflicting facts in the affidavit in the Stables' favor. But even taking this fact as true, it doesn't establish continuous and systematic contacts with Indiana. At most it establishes that there were some unsuccessful negotiations with Gumz Farms. And there are no facts as to exactly how these negotiations took place – Did Gumz Farms seeks out the Gillespies or vice versa? – or whether the Gillespies ever traveled to Indiana

7

during the negotiations. In the end, the Gumz Farms connection with Indiana is attenuated and too weak to support a conclusion that the Gillespies can be treated as present in the State of Indiana for all purposes. *See Tamburo*, 601 F.3d at 701.

DeGraff also states that the Gillespies sold Zips to Yarnelle Farms, an equine business based in Fort Wayne, Indiana in the summer of 2008. [DE 83-1 ¶ 14.] The Gillespies don't dispute this, but they correctly point out that this sale occurred more than four months after Zips left the Stables. [DE 87-1 ¶ 2.] Also, Tim Gillespie states that they didn't reach out to anyone in Indiana during this process. Rather, Yarnelle Farms contacted them in Ohio, and a representative came to Ohio to pick up Zips and took him back to Indiana. [*Id.*] The Gillespies therefore had no contact with Indiana during the process. Given that they didn't have to leave their home in Ohio to sell Zips to the farm, the fact that the farm happens to be located in Indiana doesn't translate to contact with the state. It certainly doesn't indicate continuous and systematic business contacts with Indiana.

Finally, the Stables submit that the Gillespies' physical presence in Indiana established a sufficient connection with Indiana. DeGraff states that Shannon Gillespies' mother, Karen Watters had a farm located in Indiana in 2007 and 2008, and Zips spent time there before arriving in Kentucky. The Stables reference an email from DeGraff to Shannon Gillespie where Shannon states that they were stopping to stay with Watters on their way to the farm. [DE 110-1, at 17.] According to the Stables, this stop-off contributes to the Gillespies' connection to Indiana.

The Gillespies don't deny that Shannon's mother lives in Indiana, or that they visited her when they drove through with Zips. But a road trip through a state hardly constitutes continuous

and systematic business contacts. *See Kulko v. California Superior Court*, 436 U.S. 84, 93 (1978) (basing California jurisdiction on 3-day and 1-day stopovers in that state "would make a mockery of" due process limitations on assertion of personal jurisdiction). I simply cannot conclude that a short visit to "mom's house" who happens to live in Indiana, or the mere presence of relatives in a state, opens the door to being hauled into court there.

The Gillespies' business contacts in the State of Indian are not "continuous and systematic." This Court therefore lacks personal jurisdiction over Tim and Shannon Gillespie, and the Gillespies' Motion to Dismiss [DE 109] is **GRANTED**.

**SO ORDERED**.

ENTERED: May 31, 2012

s/ Philip P. Simon  
PHILIP P. SIMON, CHIEF JUDGE  
UNITED STATES DISTRICT COURT