# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

| | | |
|---|---|---|
| BRENT HARNISH, JULIE HARNISH, STEVEN HECKAMAN, and JANIS KENGIS, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 3:10 CV 511 PPS |
| LIBERTY FARM EQUINE REPRODUCTION CENTER, LLC, DEGRAFF STABLES KENTUCKY, LLC, DEGRAFF STABLES, INC., and ROBIN DEGRAFF, | ) ) ) ) ) ) | |
| Defendants, Third Party Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| UNITED STATES, | ) ) | |
| Third Party Defendant. | ) ) ) | |

## OPINION AND ORDER

Several valuable stallions contracted an equine disease from a breeding facility in Kentucky. The owners of those horses sued Defendants Liberty Farm Equine Reproduction Center, LLC, DeGraff Stables Kentucky, LLC, DeGraff Stables Inc., and Robin DeGraff (which I will refer to collectively as "the Stables"). The Stables added the United States as a Third Party Defendant, but the complaint was dismissed. The Stables then filed a First Amended Third Party Complaint, and the United States now once again seeks dismissal. [DE 112.] For the following reasons, the United States' motion will once again be granted.

## Background

The factual background of this case has been sketched out in numerous prior opinions, but I will reiterate it here for the uninitiated reader, along with the new allegations contained in the Amended Third Party Complaint.

A hodgepodge of federal entities and regulations deal with the importation of foreign animals. The United States Department of Agriculture ("USDA") monitors the importation of foreign animals through the Animal and Plant Health Inspection Service ("APHIS") and the National Veterinary Services Laboratories ("NVSL") division. The NVSL is responsible for diagnosing domestic and foreign animal diseases. The Department of Veterinary Services ("VS") is an operational program within the USDA responsible for improving the health, quality, and marketability of animals, animal products, and veterinary biologics in the United States. The USDA accredits and works in conjunction with non-Federal laboratories that assist in animal testing. These non-Federal laboratories are referred to collectively as the National Animal Health Laboratory Network ("NAHLN").

The USDA has implemented a series of regulations to ensure that imported animals do not carry contagious diseases. When a foreign horse arrives at the port of entry, it must be quarantined, regardless of its country of origin. *See* 9 C.F.R. § 93.303(a) ("The following ports have APHIS inspection and quarantine facilities necessary for quarantine stations and all horses shall be entered into the United States through these stations [except as otherwise provided]: Los Angeles, California; Miami, Florida; and Newburgh, New York."); *see also* 9 C.F.R. § 93.308(a) ("[H]orses intended for importation into the United States from any part of the world shall be shipped directly to a port designated in §§ 93.303 and 92.324 and be quarantined at said port

2

until negative results to port of entry tests are obtained and the horses are certified by the port veterinarian to be free from clinical evidence of disease.").

This initial quarantine at or near the port of entry is referred to as the "Federal quarantine," and during the Federal quarantine the horse is subject to an examination for communicable diseases and "port of entry tests." *See* 9 C.F.R. § 93.306 (release from Federal quarantine is permitted if the horse is "found to be free from communicable diseases and not exposed thereto within 60 days prior to their exportation"); *see also* 9 C.F.R. § 93.308(a) (horses shall be "quarantined at said port until negative results to port of entry tests are obtained and the horses are certified by the port veterinarian to be free from clinical evidence of disease.").

The port of entry tests conducted at the Federal quarantine do not, however, include testing for Contagious Equine Metritis ("CEM"), a foreign animal disease that's characterized as a transmissible venereal disease. *See* 9 C.F.R. § 93.308(a)(3) (requiring testing at the port of entry for dourine, glanders, equine piroplasmosis, and equine infectious anemia). The USDA has promulgated separate regulations dealing with CEM. *See* 9 C.F.R. § 93.301(e). First, the USDA has identified several countries as "CEM-affected regions" and requires that stallions and mares from these regions be tested for CEM in the country of origin prior to export. *See* 9 C.F.R. § 93.301(e)(1)(iii) (a "set of specimens must be collected from each horse within 30 days prior to the date of export" and "cultured for CEM with negative results in a laboratory approved to culture for CEM by the national veterinary service of the region of origin"). If the results of this pre-import CEM test are negative, then, following the Federal quarantine, the horse is transported to a state that has been approved by the Administrator of APHIS to quarantine horses from CEM-affected regions. 9 C.F.R. §§ 93.301(e)(1)(i), (e)(2)(i).

3

Once the horse from a CEM-affected region is transported to the approved state, the horse must be quarantined until additional CEM testing is conducted – this is known as "the CEM quarantine" (as opposed to the aforementioned "Federal quarantine"). 9 C.F.R. § 93.301(e)(2)(ii) (the horse "shall be quarantined under State or Federal supervision until the [horses] have met the [applicable] testing and treatment requirements"). The additional CEM testing can be conducted at either the National Veterinary Services Laboratories (NVSL) in Ames, Iowa, which is part of the USDA, or at non-Federal laboratory approved by the APHIS Administrator to conduct CEM cultures and tests. See 9 C.F.R. § 93.301(e)(2)(iii). If the horse tests positive for CEM while quarantined in the approved state, then the CEM quarantine facility must comply with the treatment and re-testing procedures described at 9 C.F.R. § 93.301(e)(3).

According to the First Amended Third Party Complaint, in late 2000 a CEM-infected horse was imported into the United States without detection. Apparently the index horse was a Norwegian Fjord stallion imported into Wisconsin from Denmark in 2000 (the parties call this the "Danish Index Stallion" and I will adopt that moniker in this opinion). The Stables allege that this importation is linked to the CEM outbreak in 2008 that led to this dispute. According to the First Amended Third Party Complaint, a stallion owned by Tim and Shannon Gillespie and named Zips Heaven Sent was also boarded at a Wisconsin facility and was infected with CEM. Zips Heaven Sent was then transferred to the Stables' facility in Kentucky for breeding. He arrived there on December 12, 2007, and he brought along with him the CEM. This caused an outbreak of the disease at the Stables and led to several of the Plaintiffs' prized stallions to be infected. The Stables allege that it had no knowledge that Zips was infected with CEM and that no one knew he was infected, including the USDA, which didn't issue a CEM outbreak warning.

4

The Plaintiffs seek recovery from the Stables, alleging that the Stables were negligent in causing their horses to be infected by CEM while they were boarded there. The Stables in turn have alleged that the CEM infection is the USDA's fault because it failed to ensure that the Danish Index Stallion was properly examined, tested, and quarantined.

All of that was generally sketched out in the Stables' original complaint. The new allegations in the First Amended Third Party Complaints are focused on a USDA memorandum and a 2007 directive from USDA Deputy Administrator of VS, John R. Clifford. On January 18, 2007, Clifford advised all VS Regional Directors that the United States had been experiencing a CEM outbreak from two imported Lippenzaner stallions. Clifford therefore reminded the VS Regional Directors of the CEM procedures laid out in VS Memorandum 558.3, which had been in existence in 2000 and dates as far back as 1992.[1] The memorandum outlined procedures for treating stallions imported for breeding purposes from countries affected with CEM. [DE 105-1.] It essentially just reiterates the regulations discussed above, providing that horses imported from specified countries would be sent to an approved state and tested by an accredited veterinarian from that state, the specimens collected would be submitted to a State or Federal laboratory, and the horses would be quarantined if necessary. [DE 105-1, at 7-8.] The memorandum also provided a "CEM worksheet" to guide state veterinarians. [DE 105-1, 10.]

The Stables' original complaint sought to hold the USDA liable via the Federal Tort Claims Act, but it was dismissed, in part because the allegations against the USDA fell under the discretionary function exception to FTCA (about which more below). The Stables seem to

---

[1] The Stables Amended Complaint also includes allegations regarding VS Memorandum 558.4, which is similar to Memorandum 558.3, save for that it applies to mares rather than stallions. However, because the Stables allege that the Danish Index Horse was a stallion, VS Memorandum 558.4 is inapplicable here.

5

believe that the new allegations included in their amended complaint push it beyond the zone of "discretionary function" because the actions of Clifford and the VS Memorandum confirm that the USDA was *required* to prevent the Danish Index Stallion from triggering the CEM outbreak. As the Stables' Response brief to the new motion to dismiss puts it:

> Specifically, Liberty Farm asserts at least four duties that were breached by the United States and its employees: (a) to quarantine the CEM-infected Danish Index Stallion in 2000; (b) to test the CEM-infected Danish Index Stallion in 2000; (c) to examine the CEM-infected Danish Index Stallion in 2000; and (d) to halt the importation of the CEM-infected Danish Index Stallion once the CEM was apparent.

[DE 118, at 2.] Or, as it reiterates the point later in its briefing: "The basis of Liberty Farm's Complaint . . . is the United States' failure to quarantine the infected incoming horse, or alternatively to test the infected incoming horse, or alternatively to examine the infected incoming horse, or alternatively to halt importation of the infected horse once CEM was discovered." [DE 118, at 5.] The alleged breach of these duties forms the basis of First Amended Third Party Complaint's four counts – contribution, negligence, negligence *per se*, and common law indemnity – brought against the United States. These counts also allege that the USDA had a duty to exercise reasonable case in quarantining, testing, and examining foreign horses under Kentucky and Indiana state law principles.

## Discussion

The legal background at issue here is generally the same that was an issue in the government's original motion to dismiss. The first basic issue is the government's sovereign immunity: "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). The Federal Tort Claims Act contains a limited waiver of this immunity. 28 U.S.C. §§ 1346(b)(1), 2671-80. Section

1346(b)(1) permits recovery of money damages against the United States in the following circumstances:

> [F]or injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. §§ 1346(b)(1).

However, there are a number of exceptions to the FTCA's limited waiver, including the discretionary function exception, which states that the United States will not be held liable based on "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or any employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception to the FTCA arose from "Congress' desire to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988).

To be within the discretionary function exception, the challenged conduct must involve an "element of judgment or choice." *United States v. Gaubert*, 499 U.S. 315, 322 (1991); *Reynolds v. United States*, 549 F.3d 1108, 1112 (7th Cir. 2008). This occurs when no federal statute, regulation, or policy prescribes a course of action for an employee to follow. *Gaubert*, 499 U.S. at 322; *Calderon v. United States*, 123 F.3d 947, 949 (7th Cir. 1997). In addition, the challenged conduct must involve policy considerations. *Gaubert*, 499 U.S. at 322; *Calderon*, 123 F.3d at 949.

The Stables claim the USDA can be held liable because it breached four "duties" that

7

were imposed on it by regulations: it failed to (1) quarantine, (2) test, (3) and examine the CEM-infected Danish Index Stallion, and then failed to (4) halt the importation of the stallion once the CEM was apparent. As discussed above, the First Amended Third Party Complaint includes new allegations focused mainly on the existence of the VS Memorandum in 2000 when the Danish Index Horse arrived in the United States and the fact that VS Deputy Administrator Clifford recirculated the memorandum in 2007 when the USDA became aware of CEM in the United States. The new allegations provide flavor to the Stables claims and are an attempt to demonstrate that the regulatory structure places mandatory duties on the USDA. I find, however, that these new allegations are insufficient to change the fact that the Stables' claims are barred by the discretionary function exception. That is, the ostensible "duties" of the USDA to quarantine, test, examine, and halt the importation of the Danish Index Stallion are not duties at all because they fall under the discretionary function exception.

Let's start with the alleged failure to test for CEM. The problem with this theory is that the USDA doesn't have a regulatory duty to test for CEM; rather, the regulations put the onus on the *importer* to have CEM-testing done on their horse prior to import. *See* 9 C.F.R. § 93.301(e)(1)(iii) (a "set of specimens must be collected from each horse within 30 days prior to the date of export" and "cultured for CEM with negative results in a laboratory approved to culture for CEM by the national veterinary service of the region of origin"). After the Federal quarantine when the horse first arrives, the imported horse is transported to an approved state where it undergoes testing. The regulations never state that the USDA (or its subdivisions) have a duty to perform the testing – the duty is on the importer on both pre- and post-import. *See* 9 C.F.R. §§ 93.301(e)(1), (2). The United States can't be sued on a theory that the USDA

breached a duty that it didn't owe the Stables in the first place.

The allegations that the USDA breached duties to examine and quarantine the Danish Index Horse suffer from the same flaw. It is true that once a foreign stallion (like the Danish Index Horse) has been transported to a State approved for the quarantine of horses from CEM-affected regions, it remains under quarantine until it has "met the testing and treatment requirements of paragraph (e)(5) of this section." 9 C.F.R. §93.301(e)(2)(ii). But, once again, Section 93.301(e) proscribes requirements that the regulated industry must comply with – it does not state, or even imply, that the USDA is responsible for actually performing the "testing and treatment" of the horse while it is quarantined at the non-Federal boarding facility in the approved State. Instead, it is the importer of the horse who is responsible for arranging to have the requisite testing and treatment conducted while the horse remains under quarantine in the approved State. Thus, since there is no statute, regulation or policy that places the burden *on the USDA* to test, examine, or quarantine the foreign stallions, the discretionary function exception applies. *See Gaubert*, 499 U.S. at 322 (to overcome the discretionary function exception, there must be a failure to follow a "federal statute, regulation, or policy [that] specifically prescribes a course of action for an employee to follow").

Lastly, the Stables argue that the USDA breached a duty "to halt the importation" of the Danish Index Horse. This is an amorphous "duty" that really just describes the whole point of the entire regulatory scheme: it is an attempt to stop the importation of infected horses, most of which falls directly on the importers themselves, by *testing*, *examining*, and *quarantining*. As already demonstrated, all three of those alleged duties fall under the discretionary function exception, and thus a more generalized duty that is invented by combining those three also

9

obviously comes under the exception too.

Moreover, to the extent the Stables' are attempting to place the blame with the *state* officials who didn't examine, treat, and quarantine the Danish Index Stallion in 2000, they have no theory that would hold the United State liable for the actions of a non-Federal state veterinarian. *See* 28 U.S.C. § 1346(b)(1) (United States can only be liable for "the negligent or wrongful act or omission of any employee of the Government"). Perhaps the Stables' argument is that the USDA failed to adequately supervise and monitor the non-Federal entities, but, as I explained in my prior opinion, this is discretionary conduct falling under the discretionary function exception. [*See* DE 104 at 6-7.]

**Conclusion**

For the foregoing reasons, the United States' Motion to Dismiss is **GRANTED** and the First Amended Third Party Complaint is **DISMISSED WITH PREJUDICE**.

**SO ORDERED**.

ENTERED: July 23, 2012

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
