UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| BRENT HARNISH, JULIE HARNISH, STEVEN HECKAMAN, and JANIS KENGIS, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 3:10-cv-511-PPS |
| LIBERTY FARM EQUINE REPRODUCTION CENTER, LLC, DEGRAFF STABLES KENTUCKY, LLC, DEGRAFF STABLES, INC., and ROBIN DEGRAFF, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

There's no denying that some people have great jobs. Take a federal judge, for example. You work indoors, there's no heavy lifting, and the work is pretty interesting. It's a good gig. On the other end of the spectrum is the job at issue in this case – equine semen collector. *See Dirty Jobs: Horse Breeding* (Discovery Channel; Season 7, Episode 0; posted online on Mar. 31, 2011; *available at* http://www.mikeroweworks.com/2009/03/horse-breeding-dirty-jobs/). That's the job David Dooge did for defendant Liberty Farm Equine Reproduction Center, LLC. As we'll find out in more detail in a moment, the semen is collected with an artificial vagina (an "AV" for short). The reason we're here is that there was a glitch in the process. The unfortunate combination of sharing AV covers and the introduction of a sexually transmitted disease previously thought to be eradicated in the United States caused several of the stallions at Liberty Farm to become infected. That, in turn, reduced their value. Four owners of afflicted horses are

-1-

now trying to recoup the losses.

Two summary judgment motions are before me. First, Liberty Farm asks for summary judgment on a tort clumsily referred to as the "violation of privacy through publication of private facts." It also seeks summary judgment on the more generic invasion of privacy claim as well as the tortious interference and negligent or reckless supervision claims asserted against it. (DE 137.) There are a number of other claims not being challenged on summary judgment by Liberty Farms including bailment, negligence, professional negligence and breach of fiduciary duty claims. Second, the other defendants (Robin DeGraff and two DeGraff Stables companies) ask me for summary judgment on all of the claims against them. (DE 138.)

I'll take DeGraff's motion first. She essentially argues that Plaintiffs Brent and Julie Harnish, Steven Heckaman and Janis Kenghis (whom I'll collectively refer to as the "Stud Owners") haven't uncovered enough evidence to allow me to disregard Liberty Farm's corporate formalities and impute any of its liabilities to her or her other companies. I understand what these defendants are saying, but I want to hold off on dismissing them, at least for now. To be sure, a plaintiff attempting to pierce the corporate veil of a defendant normally faces a steep hurdle. But the Stud Owners have pointed to at least some evidence suggesting that it *might* be appropriate here. And in any event, this is a question of equity and not law, so it will be up to me to decide after a jury returns a verdict. It may even be unnecessary if there is no liability to impute to DeGraff and her companies (or if there is, but Liberty Farm has sufficient assets to satisfy it). In light of that, the most efficient course of action is to keep them in the lawsuit for the time being and address any veil piercing arguments as needed after the jury trial.

A different result is warranted with respect to Liberty Farm's partial summary judgment

motion. The tort of violation (or invasion) of privacy through the publication of private facts is difficult to formulate because there aren't a lot of reported decisions encompassing that sort of claim, and those that do address it usually focus on different elements. But one thing is clear. In order for the disclosure of a private fact to be actionable, that fact must be "highly offensive" – or significantly embarrassing – to the person asserting the claim. That's where the Stud Owners' claims fall short. It's just too hard for me to believe that a horse owner would suffer a sufficient degree of personal embarrassment simply because it became known that his or her animal was infected with an STD, and the Stud Owners haven't presented me with any evidence or even argument to make me think otherwise. They certainly might have suffered pecuniary damage from the disclosure, of course, but that's covered by their remaining claims.

I also agree with Liberty Farm with respect to the negligent/reckless hiring and supervision claims. The only person who the Stud Owners say was negligently or improperly hired or supervised is Dooge. Perhaps he didn't have enough experience at the time he was hired. But it doesn't matter now. Dooge has worked for DeGraff and her operations for at least ten years, and there's undisputed evidence he gained extensive breeding experience during this time. So regardless of whether he should have been hired in the first place, any negligence or recklessness a decade ago isn't a proximate or substantial cause of an injuries that occurred years later. Similarly, given Dooge's extensive experience breeding horses, there wasn't any reason for his supervisor (DeGraff) to think he was so incompetent as to warrant close supervision. And the Stud Owners haven't produced any evidence to the contrary. They just say that DeGraff must have been negligent in supervising Dooge given the ultimate outcome. That's not enough.

Therefore, and for the reasons set forth below, the Motion for Summary Judgment (DE

138) is **DENIED**, and the Motion for Partial Summary Judgment (DE 137) is **GRANTED** as to all challenged claims.[1]

## FACTUAL BACKGROUND

The facts of the case are complicated but mostly undisputed. The Stud Owners are four individuals who own several stallions used for breeding purposes. (DE 137-2 at 5.) Liberty Farm is a horse breeding facility located in Midway, Kentucky. (*Id.* at 1-2.) It's sole member is DeGraff, who manages the company with the assistance of a number of employees and associates, including Dooge. (DE 142-2 at 3; DE 143 at 2; DE 143-2 at 8.) DeGraff Stables, Inc. is an Ohio corporation that owns and breeds horses from an Ohio facility. (DE 137-2 at 2.) DeGraff is an officer and the sole owner of the company. (DE 142-1 at 5.) DeGraff Stables Kentucky LLC is a Kentucky limited liability company; DeGraff is the sole member of the entity. (DE 143 at 2.)

Before I start on my narrative of the case, I should address one factual issue that has become relevant – the corporate relationship and interactions between DeGraff, Liberty Farm, and the other two DeGraff companies. DeGraff says that when she communicated with at least some of the Stud Owners, she was acting on behalf of Liberty Farm. However, there is some evidence that she solicited them to use her breeding services before the company was even formed, and that she never indicated she was merely acting as a representative for a third party. (DE 140-1 at 1; DE 140-2 at 1; DE 140-3 at 1; DE 142-1 at 31-32.) There's also some evidence that Liberty Farm failed to observe normal corporate practices, like taking and retaining company

---

[1] The Stud Owners have abandoned their tortious interference claim so judgment will be entered on that claim without further discussion.

meeting minutes. (DE 142-1 at 12; DE 142-6 at 1-2.) Finally – at least for the purpose of this opinion – there's evidence that assets from the various DeGraff companies were used interchangeably by one another and by DeGraff and Dooge for their own personal use, including a Cadillac, house and even a common website. (DE 142 at 2; DE 142-2 at 2; DE 142-4.)

Let's move on to the meat of the story. In November 2007, DeGraff began soliciting the Harnishes to use her operation to breed their stallion, Gentlemen Send Roses (known informally as "Gus"). (DE 29 at 2; DE 137-5 at 4.) The Harnishes had some hesitation, but on December 14, 2007, they took her up on the offer and sent Gus to what was then Liberty Farm to have his semen collected for breeding. (DE 137-2 at 5.) On February 18, 2008, Heckaman and Kenghis sent two of their stallions (named Potential Investment and Potential Asset) to Liberty Farm for the same purpose. (*Id.*; DE 137-6 at 2.) Shortly thereafter, the Harnishes purchased another stallion, Invited Back, which they had taken to Liberty Farms to be put in the ongoing breeding season. (DE 137-5 at 5.)

All four horses had their semen collected while at Liberty Farm. It generally was a three person process. DeGraff would handle the horses. (DE 142-1 at 13-14.) An employee named James Skipper prepared them for collection. (*Id.*) And Dooge did the actual collecting. (*Id.*) He also cleaned the instruments used in the process, including the AV, which is normally used with a cover. (*Id.*) At the time Liberty Farm and DeGraff were collecting from the Stud Owners' stallions, they sometimes shared AV covers between the different horses – which, as we will soon see, will be an important fact in this case. (*Id.* at 21.)

That takes me to the heart of the case. Unbeknownst to the Stud Owners (or DeGraff and Dooge, for that matter), at around the same time that they sent their stallion to Liberty Farm,

another horse arrived on the scene. On December 17, 2007, Zips Heaven Sent (Zips for short) was taken to the farm for on site breeding and semen collection. (DE 137-2 at 4-5.) The problem was that Zips was infected with contagious equine metritis, or CEM. (*Id.* at 5.) This is a highly contagious sexually transmitted disease that's spread between horses from mating or – most relevant here – the use of contaminated breeding equipment and instruments. (DE 142-7 at 1-2.) Zips ultimately infected seven horses with CEM. (*Id.*; DE 137-13.) Evidence in the case suggests that the primary culprit behind the spread is the sharing of AV covers. (DE 142-1 at 21; DE 142-7 at 2.) Further complicating matters, at the time the United States was thought to be a CEM-free country, and horses generally weren't tested for the disease. (DE 137-3 at 3.) So there was no real way to detect the infection, at least not domestically. (*Id.*)

In any event, Liberty Farm sold horse semen throughout 2008, and it was successfully inspected by the USDA in March and October of that year. (DE 137-2 at 6.) That shouldn't be surprising because, again, the USDA wasn't testing for CEM at the time. (DE 137-3 at 3.) The semen samples were shipped and subjected to international testing at a non-USDA facility, which *did* test for CEM. (DE 137-2 at 6.) The samples tested positive, and Liberty Farm was quarantined by federal and state regulators on December 10, 2008. (*Id.*) On December 15, 2008, Liberty Farm posted an announcement on its website disclosing the quarantine, and it sent emails to its customers informing them of its status. (DE 137-11.)

No horses were identified at this point. However, on December 20, 2008, Liberty Farm began posting on its website more detailed information, including the horses that were being tested, those that were positive for CEM, and those that were negative. (DE 137-12.) This continued throughout 2009, and by at least February 27, it had indicated that Gus, Invited Back,

and Potential Asset (as well as Zips and three other horses) had tested positive and undergone successful treatment. (DE 137-13 at 1.)

The record is a bit vague on the dollar figures, but there doesn't seem to be any dispute that this positive test status reduced the value of these horses, at least to some degree. (DE 142-8 at 2-3.) The Stud Owners brought their lawsuit on December 8, 2010, seeking to recoup those losses. (DE 1.)

## ANALYSIS

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material facts exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, I must construe all facts and draw all reasonable inferences from the record in the light most favorable to the nonmoving party. *Id.* at 255.

### Piercing Liberty Farm's Corporate Veil

The first thing I'll address is the summary judgment motion by DeGraff and her companies. It essentially argues that the Stud Owners' claims only lie against Liberty Farm – the entity that took in their horses – and not its owner (DeGraff) or affiliates (DeGraff Stables Kentucky LLC or Degraff Stables, Inc.). The Stud Owners respond with two points. First, they argue, if DeGraff was acting as Liberty Farm's agent and not in her personal capacity, she never disclosed that fact. Second, even if she was representing Liberty Farm, the Stud Owners say that I should pierce the corporate veil and disregard the legal formalities separating that company

from its owner and affiliates.

It's important to recognize that this will be a question for me to resolve, and not the jury. That's because the doctrine of piercing the corporate veil is an equitable one under both Indiana and Kentucky law.[2] *See Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1234 (Ind. 1994); *Stacey-Rand, Inc. v. J.J. Holman, Inc.*, 527 N.E.2d 726, 728 (Ind. Ct. App. 1988); *Schultz v. Gen. Elec. Healthcare Fin. Servs. Inc.*, 360 S.W.3d 171, 175-76 (Ky. 2012). And the Seventh Circuit is clear that when veil piercing is an equitable doctrine under the applicable state law, it will be a question for the court – and not a jury – to decide. *See Int'l Fin. Servs. Corp. v. Chromas Techs. Can., Inc.*, 356 F.3d 731, 737 (7th Cir. 2004).

This is important, because it means that I don't have to worry about (for example) a jury being confused by the similar sounding names of some of the defendants and getting it wrong. I also don't have to worry about wasting a jury's time with evidence about whether the various DeGraff companies commingled assets with one another, or whether Liberty Farm has enough assets to satisfy a judgment against it, or whether it would otherwise be unfair unjust to shield DeGraff and her companies from Liberty Farm's liabilities (if there are any). The jury will determine whether there's any liability in the first place and then, if they find that there is, I will conduct a bench trial thereafter to determine whether I should pierce the corporate veil to allow the Stud Owners to go after Liberty Farm's owner or affiliates. Given all this, I'm inclined to

---

[2] Because this is a diversity action, I must use the choice-of-law rules of the forum state in which I am sitting. *See Land v. Yamaha Motor Corp.*, 272 F.3d 514, 516 (7th Cir. 2001). However, under Indiana choice-of-law rules, the analysis is only required if the difference in state laws is outcome determinative; if it isn't, then I should apply Indiana law. *See Ky. Nat'l Ins. Co. v. Empire Fire & Marine Ins. Co.*, 919 N.E.2d 565, 575 (Ind. Ct. App. 2010). As I'll explain throughout the opinion, the same outcome is warranted under either state's law.

give the Stud Owners the benefit of the doubt and let them proceed against all defendants if they point me to *any* evidence that would support a veil piercing theory.

They've cleared that modest hurdle here. Under both Indiana and Kentucky law, a plaintiff seeking to pierce the corporate veil of a defendant must do at least two basic things – show that the failure to do so promotes fraud or injustice, and show that the defendant is so interconnected with another entity that it is functioning as an alter ego or instrumentality of the second company. *See Inter-Tel Techs., Inc. v. Linn Station Props.*, LLC, 360 S.W.3d 152, 162-65 (Ky. 2012); *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994). With respect to the fraud or (especially) injustice component, there's no real way to decide that until the underlying claims are determined and we know (a) whether the Stud Owners win a judgment against Liberty Farm and (b) are able to collect that judgment – though I'll note there's some evidence that Liberty Farm is no longer operating as a viable enterprise, so there's at least some concern that any judgment against it would be one involving an empty shell company.

As for the corporate separateness element, both Indiana and Kentucky apply a detailed multi-factor analysis, with no particular factor controlling or dispositive. *See Reed v. Reid*, 980 N.E.2d 277, 301-02 (Ind. 2012); *Inter-Tel Techs.*, 360 S.W.3d at 162-65. These factors include (among *many* others) the commingling of assets and the failure to observe corporate formalities. *See Reed*, 980 N.E.2d at 301-02; *Inter-Tel Techs.*, 360 S.W.3d at 162-65. And at a minimum the Stud Owners have produced evidence showing that DeGraff transferred assets among her companies interchangeably without documenting the exchanges (DE 143 at 2) and that DeGraff and Dooge commandeered a house owned by DeGraff Stables Kentucky, LLC and a vehicle owned by DeGraff Stables, Inc. for their own personal use. (*Id.* at 3; DE 142-2 at 2.) There's

also some deposition testimony implying that DeGraff essentially treated the various companies as a single ongoing operation. (DE 142-1 at 11-12.)

This all may not be enough to allow me to pierce the corporate veil separating Liberty Farm from DeGraff and her companies at the end of the day. But this evidence is sufficient to clear the relatively low threshold to merely keep them in the lawsuit for now, especially given the costs and benefits – and most importantly, efficiencies – inherent in doing so. The proof will be in the pudding, and this pudding will be served up at a bench trial only if the jury finds Liberty Farm liable.

## Violation of Privacy through Publication of Private Facts

Now on to the tort of violation of privacy through publication of private facts. Kentucky law isn't entirely clear on this issue,[3] but it seems to embrace the Restatement (Second) of Torts' formulation of the species of torts generally involving invasion of privacy. *See McCall v. Courier-Journal & Louisville Times*, 623 S.W.2d 882, 887 (Ky. 1981) (adopting Restatement (Second) requirements for invasion of privacy generally in a false light case); *Cheatham v. Paisano Publ'ns, Inc.*, 891 F. Supp. 381, 384-85 (W.D. Ky. 1995) (considering an invasion of privacy through publication of private facts claim and citing both *McCall* and the Restatement (Second)). According to that standard,

> [o]ne who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is

---

[3] From what I can tell, not a single reported Kentucky state court decision specifically addresses the tort of violation of privacy through the publication of private facts, though it's mentioned in at least one opinion. Liberty Farm fails to cite any decisions as well (though it does cite a *federal* case from the Eastern District of Kentucky), leading me to believe that I'm not alone in failing to locate on point state court authority.

> not of legitimate concern to the public.

Restatement (Second) of Torts § 652D.

Indiana courts require the same showing but add another element – the publication must be "coercive or oppressive." *See, e.g., Nobles v. Cartwright*, 659 N.E.2d 1064, 1073-74, 1074 n.19 (Ind. Ct. App. 1995). The parties argue about whether Liberty Farm's disclosure of the Stud Owners' horses' CEM status meets this last requirement, but they don't point me to any cases explaining what it means. My own research likewise failed to turn up any helpful decisions – the closest I could find was a footnote in the *Nobles* case stating that "[t]he coercive and oppressive manner requirement under the Indiana definition, however, could be interpreted to refer merely to the objective circumstances surrounding the disclosure, as opposed to any culpable state of mind on the part of the discloser." *Id.* at n.19. That's obviously not especially helpful; it tells me more what the requirement *doesn't* mean than what it does.

But I don't need to resolve this question because I can't see any plausible argument that a horse's CEM-positive status is highly offensive information. It's a *horse* after all. The arguments by counsel on this issue are a little hazy. Liberty Farm's argument seems to be a long non sequitur. Basically, it contends, the information that the Stud Owners' stallions were CEM-positive wasn't highly offensive because it was helpful to the public to know which horses were infected and which ones weren't. But that doesn't make sense. Whether or not information is helpful is irrelevant to the question of whether it is highly offensive. Indeed, there's a separate requirement that the information must not be a legitimate concern to the public, which largely would be redundant under Liberty Farm's theory. Furthermore, the only case cited by Liberty Farm is one in which the disclosed information – the contents of an employees private diary –

*was* highly offensive, so it's not very instructive. *See Ghassomians v. Ashland Ind. Sch. Dist.*, 55 F. Supp. 2d 675, 679-80 (E.D. Ky. 1998).

Yet the Stud Owners' response is equally lacking. First, they don't cite *any* cases. They mainly seem to believe that it's just obvious on its face that a horse's CEM-positive status is embarrassing or offensive information. But it's not clear to me why that is necessarily true. If we were talking about a *person* being infected with an STD, I'd surely agree that this information is *per se* highly offensive. But again, we're talking about horses, and it's not plain or obvious to me that the fact that someone's horse has an STD is particularly offensive or inflammatory. The Stud Owners go on to argue that the disclosed information affected their stallions' value. But this is beside the point; the financial ramifications of the information has nothing to do with its offensiveness.

As noted above, I couldn't find *any* state court decisions from Kentucky addressing this type of tort. There are a number of Indiana cases that do, but very few of those clarify what "highly offensive" means in this context. The only one that really says anything about it is (again) the *Nobles* decision, which – in a footnote – simply states that the information in question must be "embarrassing to an ordinary person." 659 N.E.2d at 1074 n.17. That's more-or-less consistent with the Restatement (Second), which explains in a comment that "[i]t is only when the publicity given to him is such that a reasonable person would feel justified in feeling seriously aggrieved by it, that the cause of action arises." Restatement (Second) of Torts § 652D cmt. c (1977).

Some guidance is found in a handful of cases outside of Kentucky and Indiana in which physicians were found liable for disclosing information about their patients' diagnoses and

afflictions, *see Lisnoff v. Stein*, --- F.Supp.2d ----, 2013 WL 595882 (D.R.I. 2013); *Hudson v. Dr. Michael J. O'Connell's Pain Care Ctr., Inc.*, 822 F. Supp. 2d 84 (D.N.H. 2011). Another case involved a hospital employer improperly disclosing a former employee's performance review to other staff members and patients. *See Machon v. Penn. Dept. of Pub. Welfare*, 847 F. Supp. 2d 734 (E.D. Pa. 2012). A few treatises also provide a little more specific guidance; for instance, the relevant entry in *American Jurisprudence* lists five examples of potentially embarrassing or offensive facts, all of which involve private details about person's physical characteristics or his or her sexual orientation or preferences. *See* 62A Am. Jur. 2d *Privacy* § 112.

All of this suggests that the dispositive question is whether the improperly disclosed information concerns a person's history or characteristics – his health or medical history, his prior deficient employment performance, or his sexual orientation or preferences. I just can't see how information about a person's property falls within the confines of this tort. All of the examples I could find in recent cases and in treatises involve private and personal details about the actual person claiming invasion of privacy, and not merely information about his or her property. So they're all distinguishable.

To be sure, I can empathize that the Stud Owners might not want their horses' infections publicized for financial reasons. But financially disadvantageous information isn't always – or to be honest, even usually – embarrassing or offensive to the person in question. The Stud Owners simply haven't connected those two dots. And that's the main point. Summary judgment is the time in the litigation process where a party needs to lay its cards on the table and tell me how its going to prevail on its claims, assuming the jury believes its evidence. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) ("Summary judgment is the 'put up or shut up' moment in a

-13-

lawsuit."). If there is a reasonable argument that the Stud Owners' horses' CEM status is embarrassing or highly offensive information, they needed to articulate it at this stage of the case. They didn't. That's fatal to their claim of violation of privacy by the publication of private facts claim.

**Invasion of Privacy Generally**

There seems to be some confusion as to whether the Stud Owners are asserting a separate and distinct and more general breach of privacy claim aside from the claim discussed in the preceding section. To be sure, it's not pled as a separate count in their complaint, though the Stud Owners seem to act like it was in their response to Liberty Farm's partial summary judgment motion. (DE 141 at 10-11.) For its part, Liberty Farm didn't mention the claim in its opening brief (which shouldn't be surprising, given its omission from the original complaint), and it spends less than a page on the issue in its reply.

I'll follow Liberty Farm's lead and avoid spending much time on this. The first thing to say is that distinguishing between the torts of breach of privacy and invasion of privacy by giving unreasonable publicity given to the other's private life is misguided. Breach or invasion of privacy is broad category of tort that consists of a number of distinct "subtorts" (including the violation of privacy by giving unreasonable publicity given to the other's private life claim discussed above). *See McCall*, 623 S.W.2d at 887; *Nobles*, 659 N.E.2d at 1073-74 & n.14. So it's not enough for the Stud Owners to broadly claim that Liberty Farm has breached or invaded their privacy; they need to identify which of the privacy subtorts they think apply.

And which one is it here? Based on the Stud Owners' scant argument in their response, they seem to believe that Liberty Farm and DeGraff invaded their privacy by sharing information

-14-

concerning the medical condition of their horses, and especially their subsequent treatment and progress. But this nuance is simply a recasting of the same claim discussed above. If the fact that a horse is infected with an STD isn't embarrassing or highly offensive to its owner, it seems hard to imagine that disclosing that animal's treatment or progress would be any different. Therefore, even if the Stud Owners do adequately bring a separate breach of privacy claim, summary judgment is warranted with respect to it as well.

**Negligent/Reckless Hiring or Supervision**

That takes me to the final count challenged by the partial summary judgment motion, the negligent/reckless hiring and supervision claim. The Stud Owners essentially fault Liberty Farm for hiring Dooge to participate in its operations, including its semen collection efforts, despite his lack of experience doing so. They also say that the facility (and DeGraff) were negligent or reckless in supervising him at the time of the events in question. Liberty Farm disagrees about this characterization of Dooge's qualifications. It contends that the Stud Owners haven't produced any evidence to support their claim.

It's probably easiest for me to break this issue up into its hiring and supervision components. I'll start with the negligent/reckless hiring theory. "Under Kentucky law, the elements of negligent hiring and retention are: (1) the employer knew or reasonably should have known that an employee was unfit for the job for which he was employed, and (2) the employee's placement or retention at that job created an unreasonable risk of harm to the plaintiff." *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 733 (Ky. 2009). Indiana courts frame the analysis slightly differently – they just require that an employer exercise reasonable care in hiring and retaining employees. *See Sandage v. Bd. of Com'rs of Vanderburgh County*, 897 N.E.2d

507, 511-12 (Ind. Ct. App. 2008).

It doesn't matter which test I apply. A negligence claim requires something more than but-for causation in both states. Kentucky, for its part, requires that the negligence be a "substantial factor in bringing about the harm" at issue in the lawsuit. *See Bailey v. N. Amer. Refractories Co.*, 95 S.W.3d 868, 871 (Ky. Ct. App. 2001). Under Indiana law, in addition to showing but-for causation, a plaintiff must prove that "the injury was a natural and probable consequence of the defendant's conduct, which in the light of the circumstances, should have been foreseen or anticipated." *Kovach v. Caligor Midwest*, 913 N.E.2d 193, 197-98 (Ind. 2009).

The problem for the Stud Owners is that the lag between when Dooge was hired and when their stallions were infected with CEM is just too big to conclude that any impropriety in the former was a substantial factor in the latter. It's undisputed that Dooge began working for DeGraff and her various horse breeding operations in the late 1990s, and that he participated in the semen collection process for at least *ten years* before the incidents in question. That decade of working with horses necessarily negates the possibility that any inexperience at the time he was hired significantly contributed to the CEM outbreak. Put simply, even if I accept as true the Stud Owners' argument that Dooge never should have been hired due to his inexperience, by they time their horses were infected, he wasn't inexperienced at that point – and certainly not enough for it to be a substantial factor in causing the infection.

The analysis is a bit different with respect to a negligent/reckless supervision claim, though the end result is the same. Kentucky has adopted the Restatement (Second) of Agency's formulation of a negligent supervision claim: "A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or

reckless: ... (c) in the supervision of the activity." Restatement (Second) of Agency § 213 (1958); *see also Smith v. Isaacs*, 777 S.W.2d 912, 914 (Ky. 1989). Indiana courts have fleshed this out a bit more. "Negligent retention and supervision is a species of negligence and has the following elements: 1) a duty of care owed by an employer to a third person; 2) breach of that duty; and 3) injury to the third person proximately caused by the employer's breach." *Scott v. Retz*, 916 N.E.2d 252, 257 (Ind. Ct. App. 2009) (*citing Clark v. Aris, Inc.*, 890 N.E.2d 760, 763 (Ind. Ct. App. 2008)).

The Stud Owners' sole – and once again, virtually unsupported – argument seems to be that because there must have been *some* negligence in the semen collection process, DeGraff and Liberty Farm necessarily must have been negligent in supervising the collector. That doesn't make sense, for two reasons.

First, the question of whether Liberty Farm's employees were negligent or reckless in collecting semen from the Stud Owners' stallions in the first place is separate and distinct from the question whether Liberty Farm was negligent or reckless in supervising them. And while the Stud Owners' have produced some evidence supporting their position on the first issue, they haven't done so on the second. They acknowledge that there's no way to know the exact details concerning the infection of each of their horses but argue that if ordinary care had been taken then those infections likely would not have occurred. Perhaps they're right. Perhaps this sort of scenario calls for the application of a *res ipsa loquitur* negligence presumption. *See, e.g., Sadr v. Hager Beauty Sch., Inc.*, 723 S.W.2d 886, 887 (Ky. Ct. App. 1987) (noting that the *res ipsa loquitur* doctrine is an evidentiary doctrine which allows a jury to infer negligence on the part of the defendant); *Johnson v. Wait*, 947 N.E.2d 951, 959 (Ind. Ct. App. 2011) ("*Res ipsa loquitur*,

or 'the thing speaks for itself,' is a rule of evidence that permits an inference of negligence to be drawn based upon the surrounding facts and circumstances of the injury.").

But that invariably would go to their negligence and professional negligence claims, not their negligent/reckless supervision ones. Or to put it slightly differently, I can buy the argument – at least for now – that given the horses' infection, we can presume that *something* went wrong in the collection process. Yet this "something" doesn't have to involve supervision. One could easily imagine any number of scenarios in which DeGraff or another supervisor paid the appropriate amount of attention to what Dooge was doing, and yet CEM still spread, perhaps even negligently or recklessly. For example, there's some evidence suggesting that DeGraff and her team simply performed too many semen collecting procedures to be able to observe adequate standards of cleanliness and hygiene. (DE 142-7 at 1-2.) If that's right, it's certainly strong evidence of negligence or recklessness on the part of Liberty Farm and/or its employees, but it doesn't necessarily mean that the *supervision* of any particular employees should be faulted.

Second, based on my understanding of Liberty Farm's collection methods, it seems exceedingly unlikely that Dooge was inadequately supervised as a factual matter. Indeed, as I noted when describing the facts of the case, it looks like he was accompanied by DeGraff and one other employee in the vast majority of collection procedures. How could this even arguably constitute negligent or reckless supervision? The bottom line is that Dooge or other Liberty Farm employees may well have been negligent while collecting semen from the Stud Owners' horses, but there's just no evidence that this underlying misconduct automatically should be traced to his employer's (alleged) negligent or reckless supervision. Therefore, summary judgment is appropriate on this claim as well.

## CONCLUSION

For all of the reasons discussed above, the Motion for Summary Judgment (DE 138) is **DENIED**, though DeGraff and her companies will have the opportunity to reassert their veil piercing arguments after the jury returns its verdict if they need to. The Motion for Partial Summary Judgment (DE 137) is **GRANTED** with respect to all challenged claims.

**SO ORDERED**.

**ENTERED**: June 25, 2013.

s/ Philip P. Simon<br>
PHILIP P. SIMON, CHIEF JUDGE<br>
UNITED STATES DISTRICT COURT